In the Matter of the Probate of the Last Will and Testament of PAUL STREB, Deceased.
ANTHONY BLEILE, Proponent, Appellant, Respondent; SOPHIA E. LONG and Others, Contestants, Respondents, Appellants.

Fourth Department, May 6, 1936.

*Charles B. Bechtold*, for the proponent-appellant-respondent.

*Cyril L. Kendall*, for the contestants-respondents-appellants.

EDGCOMB, J.  Paul Streb, late of the city of Rochester, N. Y., died on the 8th day of January, 1935, leaving an estate valued at approximately $8,000.

Some four years before his death, on March 20, 1931, to be exact, he executed what is claimed to be his last will and testament. This instrument has been denied probate.  The jury before whom the case was tried has found that the decedent was of sound and disposing mind and memory, but that the execution of the will was procured by means of undue influence or fraud.

The duty of proving that decedent was under restraint when he executed this will rests upon the contestants.  (*Matter of Schillinger*, 258 N. Y. 186, 192; *Matter of Anna*, 248 id. 421, 427; *Matter of Kindberg*, 207 id. 220, 228.)  They have not, in our opinion, sustained that burden, and such failure on their part calls for a reversal of the decree denying probate.  We find no evidence which justifies such a finding.  The presumption is all the other way.

It is said by Judge EARL in *Rollwagen* v. *Rollwagen* (63 N. Y. 504, 519) that it is impossible to define with precision or exactness what constitutes undue influence, or what the quality and extent of the power of one mind over another must be to make it *undue.* The rule seems to be well established, however, that the influence which will be sufficient to avoid a will must amount to moral or physical coercion or fraud, and must be ample to overpower the mind of the testator, and to destroy his freedom of independent action and to substitute for his own will that of another.  (*Smith*

v. *Keller*, 205 N. Y. 39, 44; *Matter of Dowdle*, 224 App. Div. 450, 454; affd., 256 N. Y. 629; *Matter of Rundles*, 216 App. Div. 658, 662; *Children's Aid Society* v. *Loveridge*, 70 N. Y. 387, 394; *Matter of Powers*, 176 App. Div. 455, 456; *Matter of Martin*, 98 N. Y. 193, 196; *Matter of Bogardus*, 198 App. Div. 399, 403; *Matter of Snelling*, 136 N. Y. 515, 517; *Matter of Cornell*, 43 App. Div. 241, 242; affd., 163 N. Y. 608; *Matter of Ruef*, 180 App. Div. 203, 205; affd., 223 N. Y. 582; *Matter of Fleischmann*, 176 App. Div. 785, 786.)

It is common knowledge that the amount of persuasion necessary to induce a person to act against his will depends entirely upon the individual. It is much easier to influence and control a mind naturally weak or impaired by age or infirmity than it is to sway one which is strong and vigorous.

We start here with a finding that the testator had a mind sufficiently alert and strong to entitle him to dispose of his property as he saw fit. True, he was around seventy-two years of age at the time the will was executed, but he was not so feeble that he was unable to live alone, attend church, or look after his own affairs. The jury has found that whatever infirmities he may have had did not affect his mental condition to such an extent as to deprive him of testamentary capacity; that he had, at least, sufficient intellectual power to understand and comprehend the nature, extent and condition of his property, the natural objects of his bounty, and the meaning, effect and scope of the provisions of his will. An aged or decrepit person is not deprived of the right to dispose of his property by will, and the mere fact that he may be somewhat enfeebled by age does not mean that he is easily controlled or managed, nor does it raise any inference that some interested person has gained the ascendency over him, and dictated the terms of his will. (*Matter of Duffy*, 127 App. Div. 174; *Matter of Wolf*, 196 id. 722; *Horn* v. *Pullman*, 72 N. Y. 269, 276; *Lesster* v. *Lesster*, 178 App. Div. 438, 446; *Dobie* v. *Armstrong*, 160 N. Y. 584, 593.)

Decedent had no relatives nearer than nephews and nieces, and it does not appear that he was especially close or friendly with any of them. He did, however, give five of them $100 each. He was a devout Catholic, and left $700 to be used for masses for the repose of his soul and that of his widow, who predeceased him by some twenty-two years, and to certain institutions of the church. The residue of his estate he left to Anthony Bleile and his wife, who were not connected with him either by blood or by marriage. While it is not particularly clear why he should have made these people the recipients of his generosity, except that

they had been kind to him, he was entitled to give his property to whomsoever he saw fit. No obligation rested upon him to provide for these distant relatives. Under the circumstances the will cannot be said to be an unnatural or unreasonable one. The mere fact that the testator chose to give his property to a stranger rather than to his own relatives is no evidence that he acted under restraint. (*Heath* v. *Koch*, 74 App. Div. 338, 340; affd., 173 N. Y. 629; *Dobie* v. *Armstrong*, 160 id. 584, 593; *Thompson* v. *Peterson*, 152 App. Div. 667, 673.)

Neither does the fact that the decedent made two prior wills, one on the 8th of August, 1929, and the other on the 28th of November, 1930, raise any presumption of fraud. A person may make as many wills as he chooses.

There is no evidence of any declaration of the testator made at or about the date of the will or at any time thereafter indicating a desire on his part to dispose of his property in any manner other than as provided in the instrument itself.

Nor is there any incident connected with the preparation or execution of the will which indicates, much less proves, that testator's mind was overpowered, or that he was induced to do something which, had he been left alone, he never would have done. Nothing was said or done by any one to influence him in the disposition of his estate.

The will was drawn by H. Niles Eddy, an attorney residing in Rochester. According to Mr. Eddy the document was prepared strictly in accordance with the instructions given him by the decedent. There is no evidence to the contrary. Testator took the will away with him, and went to a neighbor, William Greinke, and asked him and his wife to sign it as subscribing witnesses. They had witnessed one of his previous wills. No one accompanied Mr. Streb to his attorney's office, or to the home of his neighbor. None of the beneficiaries mentioned in the will was present at either place. The will, so far as the evidence shows, was the sole product of decedent's own thought and wish.

If any one interested in the will talked with the decedent before he went to his attorney's office, and there is no evidence of any such conversation, testator had ample opportunity to shake off their influence when he gave his attorney the instructions which he desired carried out. If the will did not represent the testator's own thought and desire, the occasion was offered him to assert himself, and refuse to execute the document, before he went to Greinke's house. Even after the will was signed, decedent, if he thought that he had been unduly swayed into doing something

he did not want to do, had plenty of time to destroy the will before he returned it to Mr. Eddy for safekeeping; even after that he had control of the document, and could, up to the time of his death, a period of nearly four years, have demanded its return, and corrected any wrong which had been done him. It is rather difficult to imagine that the Bleiles had such complete mastery over the testator during all this time.

But the contestants urge that the jury was justified in finding from the evidence that Mr. Eddy was a part of the conspiracy to induce the testator to give the larger part of his property to the Bleiles, and was acting for and on their behalf, and was using his influence and power to induce the testator to make the will in question. They base their contention upon the fact that decedent and Mr. Eddy were total strangers, and that on December 1, 1930, testator wrote Eddy a letter stating that he was dissatisfied with his former will, and that he wanted Eddy to draw a new one for him; that when Streb failed to put in an appearance at Mr. Eddy's office, Eddy wrote him a letter asking for the details of the proposed will, and stating that, with such data, the will could be prepared, and, if necessary, taken to the testator's house for execution. In Eddy's letter he suggested that the testator inform him just how much he wanted to leave to charity, and how much for saying masses, if any.

It is suggested that the reason for choosing an entire stranger to draw the will is shrouded in mystery, and that there must have been some master mind controlling testator's action and directing him in the desired channel; it is suggested that Mr. Eddy was following up the matter with more than ordinary zeal, and that it is incredible that an entire stranger would have known that the testator wanted to include in his will a provision for the saying of masses, or a gift to charity.

Conjectures of how testator happened to choose the attorney he did are as idle as they are interesting. Testator had a right to employ any attorney he desired. Neither surmise, conjecture nor doubt can take the place of proof; nor do they call for explanation. Proof of undue influence must be of a substantial nature; it cannot be predicated on fancy, suspicion or vague assumption. The possibility that restraint might have been indulged in is not sufficient to set aside a will. (*Thompson* v. *Peterson*, 152 App. Div. 667, 673.)

Eddy and Bleile were not friends; they had no speaking acquaintance. Even if Bleile had set out to use his persuasive powers to induce the testator to leave him his property, it is hardly probable that he would have chosen an entire stranger to act as his agent.

Although Eddy had drawn the will and had it in his possession up to the date of testator's death, Bleile refused to permit him to probate it. Had there been any arrangement or understanding between the two, prior to Eddy's drawing testator's will, it would seem that Bleile would naturally have selected Eddy to push the transaction to a close by having the will probated.

We are, therefore, led to the conclusion that the jury went far astray when they found that the will in question was the result of a master mind which overawed and overpowered the testator. Decedent having been found to be of sound and disposing mind and memory, we think the will was entitled to be admitted to probate.

For these reasons we think that the decree in so far as it denies probate to said will because the testator was under restraint at the time he executed it should be reversed, and the matter remitted to the Surrogate's Court of Monroe county to enter a decree admitting the will to probate. (*Matter of Burnham,* 234 N. Y. 475.)

All concur. Present — SEARS, P. J., TAYLOR, EDGCOMB, CROSBY and LEWIS, JJ.

Decree so far as appealed from by contestants affirmed, and decree so far as appealed from by proponent reversed on the law and facts, with costs to the appellant-proponent payable out of the estate, and matter remitted to the Surrogate's Court with directions to admit the will to probate in accordance with the opinion.